631 So.2d 1301 (1994)
Virginia KIRBY
v.
LANGSTON'S FURNITURE & APPLIANCE, INC., Snapper Power Equipment and XYZ Insurance Company.
No. 93-CA-1673.
Court of Appeal of Louisiana, Fourth Circuit.
January 27, 1994.
*1302 Patricia D. Miskewicz, Ramirez & Miskewicz, New Orleans, for plaintiff/appellant.
W.K. Christovich, Christovich & Kearney, New Orleans, for defendant/appellee.
Before BARRY, WARD and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE
This is an appeal from a judgment of the 25th Judicial District Court granting the motions of defendant, Snapper Power Equipment (Snapper), for a directed verdict in its favor and, alternatively, for judgment notwithstanding the jury's verdict (JNOV) in favor of plaintiff, Virginia Kirby.
Kirby claimed damages sustained when she fell off a riding mower manufactured by Snapper. By answers to special interrogatories, the jury found the Snapper mower was unreasonably dangerous in design when it left Snapper's possession, but found Snapper not liable for failure adequately to warn the plaintiff. The jury found that plaintiff sustained damages of $275,000, of which 60% were attributable to her own negligence.

SUMMARY OF THE FACTS
On July 19, 1982, plaintiff and her nowdeceased husband purchased from Langston's Furniture and Appliances, Inc.[1] a riding lawnmower manufactured by Snapper in May, 1982. Plaintiff was injured on September 6, 1988, when she fell from the mower while cutting her lawn. She testified that while cutting grass, with the mower in second gear, she began to feel the mower tilt, panicked, thrust her right foot out and down, and her leg was caught instantaneously by the mower, causing her to be dragged an *1303 unspecified distance while holding onto the mower's handlebars. While there was no injury to or below her right knee, the blade cut deeply into her right inner thigh, causing serious lacerations requiring a skin graft by a plastic surgeon.
Plaintiff's Snapper mower was not equipped with an operator presence control, or "deadman's switch." This type of device, which became a part of Snapper's riding mower design in late 1982, is designed to stop the mower blade from spinning upon the operator's release of a control, either by her hand or foot, thereby allowing her to remove objects from the mower's path without having either to encounter the spinning blade when she returns to the machine or completely stop the mower's engine. The "deadman's switch" brings the blade to a stop after a delay of between three and five seconds. This delay caused by inertia cannot be overcome without creating an unsafe condition, since an immediate blade stop would cause the blade's inertia to be expressed within the mower structure itself, causing the structure to move violently, jarring the operator from her seat.
Because of this three to five second delay, the "deadman's switch" device is not considered a protection for unplanned dismounts, such as falls or panic situations. It serves to protect the operator when she leaves and returns to the mower, and protects third persons who are in the near vicinity of a temporarily unattended mower from the spinning action of the blade.
The plaintiff's riding mower was provided with warnings, both on the mower in plain view of the operator and in the owner's manual, cautioning against use of the mower on inclines of 15 degrees or more, requiring great caution on inclines of 10 degrees, and warning, "BEFORE PUTTING FOOT ON GROUND DISENGAGE BLADE AND MOTOR DRIVE!" These warnings were plainly visible to the operator when she was seated on the mower, were written in bold, contrasting block letters and were accompanied by the attention-getting device of a triangle containing an exclamation point. The plaintiff testified that she and her husband had read the manual carefully and were aware of the dangers involved in mowing on an incline, and never used the riding mower on the slope of the ditch located on their property, always mowing this area with a hand-operated push mower.
On September 6, 1988, while cutting grass astride her Snapper riding mower, plaintiff felt the mower tilt,[2] extended her right foot as far as she was able, panicked, and, while holding tightly to the mower's handlebars, fell, catching her leg in the mower's undercarriage. The mower continued its forward movement and she was carried along with it until she released her grip on the handlebars.
Plaintiff's right upper inner leg was cut by the mower blade. She sustained no injury to her foot, ankle, lower leg or knee.

EXPERT TESTIMONY
L.D. Ryan testified on behalf of plaintiff. While he had never operated the mower in question, had never designed a mower or a mower part to obtain a patent, and had never testified in a lawnmower case, he was qualified by the trial court to give opinion evidence as a mechanical engineer.
His testimony related to three elements of design which he opined constituted product defects:
[1] LACK OF A SLOPE INDICATOR
Because there was some evidence that the mower might have tipped over on the slope to the ditch adjacent to plaintiff's lawn, Ryan tested a device that measured the degree of slope. He offered an opinion that the mower was defective by virtue of its failure to have such a device, but he did not offer any evidence as to how installation of such a device could have prevented the accident. His opinion, and plaintiff's testimony that the accident occurred on level ground, makes the absence of this device irrelevant.
*1304 [2] LACK OF A "DEADMAN'S SWITCH"
While admitting that at the time the mower left Snapper's possession it met all government and industry standards, and that operator presence controls were not in general use in the industry until the late 1980's, Ryan opined that the mower's lack of such a device constituted a design defect. Significantly, he did not offer the opinion that the deadman's switch, with its three to five second delay[3] in stopping the blade, would have prevented or diminished plaintiff's injury. Because the plaintiff's fall and injury occurred before the blade's spinning action would have stopped, even had the mower been equipped with a deadman's switch, the installation of the switch could not have prevented Mrs. Kirby's injury. Ryan, in fact, did not offer the opinion that installation of the switch would have prevented the injury.
The uncontroverted evidence of record in the testimony of engineers Richard Rhinehart and David Sassaman establishes that the deadman's switch (or, indeed, any safety device now available in the riding mower market) would not have prevented plaintiff's injury. Ryan admitted on cross-examination that the American National Standards Institute (ANSI) standard on which he relied in both his reports concerning the mower in question was the standard of 1986, effective after 1987; he further admitted that the operator presence control/automatic blade stop device was not required by the ANSI standard in effect at the time the mower left Snapper's control and was placed into commerce. He admitted that the mower did not violate any ANSI standard in effect at that time. Most importantly, the testimony is uncontroverted that the device is not designed, in any event, to protect against involuntary exit, by means of a fall or other "bailout", and would not have enabled plaintiff, under the conditions of her accident, to have escaped the injury which she sustained.
[3] FOOT GUARD
In Ryan's opinion, plaintiff's injury occurred when she put her foot on the ground and it caught in the foot guard located on the side of the blade housing. Ryan rejected any suggestion that plaintiff started to tip over while cutting a slope. He insisted she was cutting in a straight line on level grass when she felt the mower starting to come over and put her foot out to the side. Ryan admitted that he did not know why, under these conditions, plaintiff would sense that the mower was tipping over, and made no attempt to incorporate this testimony into his theory. He ignored the plaintiff's deposition testimony and reports of the medical emergency technicians and treating physicians that the mower was variously cutting in the ditch, on a slope, or tipping over when the plaintiff put her leg out and the accident occurred. Ryan admitted that Mrs. Kirby in deposition did not say her foot was caught in the foot guard.
There is no evidence in the record to support the predicate for his opinion. The predicate is also contradicted by tests he performed on Mrs. Kirby's mower. He tested the stability of the mower on a plywood board with inclines of up to 44 degrees and concluded:
"It did not tip. It is like the rollover coefficient is very good and it is a very stable machine as far as tipping over.... [At] thirty-nine degrees, when the wheels started to skid. This was on a piece of *1305 plywood.... We blocked the wheels with little cleats so it wouldn't slide anymore and raised it up forty-four degrees before it started to tilt."
When asked to compare the laboratory results with what could be expected were the lawnmower operated on grass rather than plywood, Ryan pointed out that the coefficient of friction would have been lower, and the mower would have been less likely to tilt, and more likely to just slide down the slope without tilting or turning over. He then opined, "I don't think the thing tipped over or tipped at all on that hill."
Ryan's theory of the accident also ignores the uncontroverted physical evidence that there was absolutely no injury to plaintiff's toes, foot, ankle, calf, lower leg or knee. Because the blade cuts at high speed (at least 200 cuts per second in second gear), it is inconceivable that the entire lower portion of plaintiff's leg, from the toes to just above the knee, could be dragged through the rapidly spinning blade without sustaining even a scratch. Ryan does not offer an explanation of this phenomenon. In his demonstration, with the motor off, Ryan jacked up both the front of the mower and its rear in order to "feed" his employee's leg under the carriage. Assuming that this could be accomplished with the mower operating at a normal distance from the ground, and with the motor on and blade spinning, plaintiff's foot, ankle and lower leg would pass within one-quarter inch of the rapidly spinning mower blade. There was no credible evidence that such activity could result in an injury confined solely to the upper inner thigh without even a scratch on the leg, ankle and lower leg.
We share the concern expressed by the trial court in his reasons for judgment that there is an absence of fact or scientific data utilized by Ryan in forming his opinion as to the ultimate causation of this accident.
"The value of an expert witness' opinion depends on the existence of the facts on which it is predicated." Russ v. Jones, 580 So.2d 1098, 1100 (La.App. 4th Cir.1991).
Ryan rejected the testimony of the plaintiff, the technicians who responded to her emergency call, and the physical medical evidence in formulating his opinion that the foot guard constituted a defective design that caused plaintiff's injury. His opinion must be rejected because it is based on his own conjecture and speculation and ignores empirical data and the testimony of witnesses. See, Patterson v. Meyers, 583 So.2d 79, 84 (La.App. 4th Cir.1991); Hobgood v. Aucoin, 558 So.2d 1285 (La.App. 1st Cir.1990), writ granted 563 So.2d 889, affirmed 574 So.2d 344 (La.1990).
Because Ryan's testimony is insufficient to establish a defective design or to establish causation, even when viewed in the light most favorable to plaintiff, it does not support the jury's finding of liability. Resolution of this issue does not involve the acceptance of the testimony of one party's experts and the rejection of another based on credibility. The issue here is not credibility of the evidence but sufficiency of the evidence. The expert testimony is not contradictory, but plaintiff has simply failed to prove her case. The manifest error rule does not require affirmance of the jury verdict based on such insufficient evidence. Patterson v. Garic, 411 So.2d 1091, 1094 (La.App. 4th Cir.1982), writ denied, 415 So.2d 950 (La.1982).

APPLICABLE LAW
LSA-C.C.P. Art. 1811 provides for judgment notwithstanding a jury verdict, but does not mandate the standards for granting such a judgment. Because this codal article is based on a federal rule of civil procedure, the Louisiana Supreme Court adopted the standard set forth in Boeing v. Shipman, 411 F.2d 365 (5th Cir.1969):
"When `the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions [for directed verdict or for judgment notwithstanding the verdict] is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied....' 411 F.2d at 374." Scott v. Hospital Service District No. 1 of the Parish *1306 of St. Charles, 496 So.2d 270, 273-274 (La. 1986).
In reviewing the propriety of the trial court's judgments alternatively for a directed verdict and for judgment notwithstanding the jury verdict, a single standard applies. A directed verdict on liability is appropriate only when the trial judge is convinced that reasonable minds could not differ in their interpretation of the evidence. Reilly v. Dynamic Exploration, Inc., 571 So.2d 140 (La. 1990).
At the time the mower left Snapper's possession, it met all governmental and industry standards pertaining to riding lawnmowers. Plaintiff contends that the absence of a "deadman's switch" that would automatically stop the blade when the driver left his seat, is a design defect for which Snapper was liable under the provisions of the Louisiana Products Liability Act (LSA-R.S. 9:2800.51 et seq.) (LPLA), particularly LSA-R.S. 9:2800.56. Plaintiff also asserted a claim under LSA-R.S. 2800.57 that the mower was unreasonably dangerous because of inadequate warning, but this claim was rejected by the jury, and plaintiff has not appealed that portion of the verdict.
In order to prove a claim under the LPLA, plaintiff must prove that at the time the mower left Snapper's control:
(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
(2) The likelihood that the mower's design would cause the plaintiff's damage and the gravity of that damage outweighed the burden on Snapper of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the mower. An adequate warning shall be considered in evaluating the likelihood of damage when Snapper has used reasonable care to provide the adequate warning to users and handlers of the mower. (Applying LSA-R.S. 9:2800.56)
The plaintiff's claim of a design defect rests solely on the testimony of her expert, L.D. Ryan. While he offered an opinion that the mower should have incorporated three design elements, a slope indicator, deadman's switch and removal of the foot guard, he did not claim that the addition of the first two elements would have prevented plaintiff's injury.
The slope indicator was, under Ryan's analysis, irrelevant, since he denied that the accident occurred on a slope, and plaintiff testified that she knew (without the necessity of a slope indicator) that she should never use the riding mower when cutting the grass in her ditch.
The presence of the deadman's switch was likewise irrelevant.[4] Defendant's expert *1307 witness, Richard Rhinehart, testified that the deadman's switch or operator presence control was not designed to prevent this type of "bailout" blade contact injury. The evidence of record shows that had the dead man control which exists today been present on Mrs. Kirby's mower, her accident would not have been prevented. A similar conclusion was reached in Gauthier v. McDonough Power Equipment, Inc., 608 So.2d 1086, 1090 (La. App. 3rd Cir.1992).
In fact, the manuals on machines manufactured after 1982, and having the ABS device, still contain the same consumer warnings against tip-overs, bailouts, panic exits and the injunction not to put one's foot on the ground before the machine has come to a stop. This reflects an awareness that the ABS was not designed to protect operators from panic bailout injuries such as that suffered by Mrs. Kirby.
His opinion that the foot guard should have been removed is not sufficient to support the jury's finding of design defect. Ryan ignores the testimony of the plaintiff, treating physicians and emergency medical technicians as to how the accident occurred and, most significantly, posits a scenario that is clearly contradicted by the physical evidence. If the accident had occurred as Ryan outlined, the plaintiff would have suffered severe injury to her toes, foot, lower leg and knee. These areas, under Ryan's view of the accident, passed unscathed within one-quarter inch of the plane of the high-speed blade's path. While issues of credibility should not be decided in connection with a motion for a directed verdict, Reilly, supra at 145; Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991), the motion cannot be defeated merely by characterizing a particular finding as a matter of credibility. Where the objective evidence so contradicts a witness' story, or the story itself is so implausible or inconsistent on its face, the court of appeal may find a verdict to be manifestly erroneous or clearly wrong even if purportedly based on a credibility determination. See Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
The trial court, in vacating the jury verdict finding a design defect, held that plaintiff failed to prove the first element of a § 2800.56 claim, that is, that the incorporation of the alternative designs suggested by Ryan would have avoided the plaintiff's injury. In reaching this decision, the court applied the correct standard for review of a jury verdict on a motion for JNOV:
"... when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict.... Anderson, supra at 832.
To support the jury verdict requires some reasonably credible evidence that the alternative design would have prevented the plaintiff's injury. See Cosse v. Allen-Bradley Co., 601 So.2d 1349 (La.1992); Bloxom v. Bloxom, 512 So.2d 839 (La.1987). The plaintiff's expert's bare statement that an alternative design would have prevented her injury is insufficient. Ingram v. Caterpillar Machinery Corporation, 535 So.2d 723 (La. 1988), rehearing denied January 19, 1989.
In granting defendants' motions for JNOV and for directed verdict, the trial court applied the proper standard. Considering the evidence and reasonable inferences in the *1308 light most favorable to the opposing party, while not weighing the evidence, passing on the credibility of the witnesses, or substituting its factual judgment for that of the jury, the trial court properly granted the defendant's post trial motions. Pattison v. Valley Forge Insurance Co., 599 So.2d 873 (La.App. 4th Cir.1992), writ denied, 604 So.2d 1001 (La.1992); Scott v. Hospital Service District No. 1 of the Parish of St. Charles, supra; Boudreaux v. Schwegmann Giant Supermarkets, 585 So.2d 583 (La.App. 4th Cir. 1991), writ denied 590 So.2d 593 (La.1992) and writ denied 590 So.2d 595 (La.1992).
AFFIRMED.
NOTES
[1] An original defendant herein, Langston's Furniture and Appliances, Inc. filed a motion for directed verdict which was granted by the trial court. Plaintiff did not appeal that judgment.
[2] Neither plaintiff nor her expert witness offered an explanation for this phenomenon. At deposition, plaintiff testified she was on a slope, and the report of the attending paramedics shows she said she was cutting grass in a ditch at the time of the accident. At trial, plaintiff and her expert insisted the accident occurred while plaintiff was cutting grass in a straight line on level ground.
[3] Ryan suggested that Snapper could have incorporated an ABS designed by Professor Sabert of Wichita State University, which can stop a Snapper blade within three-quarters of a second. This design was offered to Snapper; however, on taking the machine out of the laboratory, it was discovered that while it unarguably did stop the blade quickly, the mower was incapable of cutting grass. Sabert focused on one aspect of mower design: making the blade stop, but neglected the fact that the mower had to be able to cut grass in order to be suitable for consumers. The Court is called upon to decide questions of social utility that require consideration of the particular case in terms of moral, social and economic considerations, in the same way that the legislator finds the standards or patterns of utility and morals in the life of the community. B. Cardozo, The Nature of the Judicial Process, at p. 105 (1921); Entrevia v. Hood, 427 So.2d 1146, 1149-50 (La.1983). The social utility of a lawnmower lies in its ability to cut grass. Plaintiff offered no evidence of a device that would both cut grass and stop its blade quickly enough to avoid the type of injury Mrs. Kirby suffered. Plaintiff has, therefore, failed to prove an effective alternate design.
[4] The history of the development of the operator presence control/automatic blade stop device (ABS) was outlined by Richard Rhinehart, qualified by the court as an expert in mechanical engineering, who had worked for Snapper during this developmental period as a product engineer developing lawnmowers.

The consumer accident studies showed certain kinds of injuries that could be alleviated through development of an efficient and useable ABS. The accidents that gave rise to this research did not involve bailouts or involuntary dismounts wherein the injury occurred contemporaneously with a fall or panic dismount.
In the early 1970's, Toro developed an electrical ABS, which proved unworkable. Because mowers are typically subject to dust, dirt and grass, and are generally poorly maintained, an electrical switch proved too delicate, and the continual failure of the switch caused consumer frustration.
The goal was to design a blade stop time of 3 to 5 seconds. This would address the injuries reportedly caused when the operator left the mower to do some other yard work or otherwise and then returned to remount the machine. It would also help to prevent injuries to third persons and animals who approach a temporarily unattended machine. Blade stops of under three seconds create significant problems with materials flying apart, blades separating from the blade adapter and shafts breaking. The consequences of a blade stop of under a second include broken and thrown belts and disequillibration of the mower itself, in which the mower literally jumps off the ground. Safety concerns led to rejection of such a short blade stop time.
In 1979, Snapper's work on a mechanical ABS resulted in its first engineering prototype. This prototype met Snapper's criteria for safety and reliability. Second and third prototypes were produced in a continual development process refining the device. In March, 1980, Snapper applied for a patent on the basic mechanical ABS device. Snapper was particularly interested in providing an ABS so easy to use that consumers would not become frustrated and disable or defeat the device. This had led to the ineffectiveness, of the Toro electric switch (which was a more sophisticated version of the electrical seat switch Ryan suggested would constitute a preferred design). In May of 1981, tooling was still incomplete. A patent was issued to Snapper in November, 1981.
During product testing, Snapper determined that the brake design was insufficient for the length of time and number of cycles anticipated in the mower's expected useful life of at least ten years. Endurance tests were completed in March, 1982.
Fifteen machines were manufactured as prototypes and tested in the homes of Snapper employees. In July, 1982, the results of these tests were evaluated. Two hundred additional prototypes were then manufactured, essentially by hand, and were released for further controlled study. In September, 1982, the new model went into production.
Throughout this process, the ABS was not designed to protect the operator in case of an involuntary or panic dismount. In such a case, the machine is still moving (in second gear, for example, at 3 and one-half feet per second. Thus, within one second the machine is away from the operator; if the operator is injured, the injury occurs within one second of bailout, and the ABS, with its stopping time of between 3 and 5 seconds, is unable to avoid the injury.