650 So.2d 385 (1995)
Patricia Ann MISTICH, et al.
v.
VOLKSWAGEN OF GERMANY, INC., et al.
No. 94-CA-0226.
Court of Appeal of Louisiana, Fourth Circuit.
January 31, 1995.
Rehearing Denied March 14, 1995.
*386 J. Van Robichaux, Jr., Chalmette, and Glenn E. Diaz, Chalmette, for plaintiffs/appellees.
Sessions & Fishman, Robert E. Winn, Joy Goldberg Braun, Sharon Cormack Mize, New Orleans, for defendants/appellants.
Duplass, Witman, Zwain & Williams, David J. Bourgeois, Metairie, for intervenor/appelleeAetna Cas. & Sur. Co.
Before SCHOTT, C.J., and BYRNES and WALTZER, JJ.
SCHOTT, Chief Judge.
This is a wrongful death and survival action by the surviving spouse and children of Carmen Mistich who died on December 13, 1986, as a result of injuries she sustained in an automobile accident two months previously. The defendants are Volkswagen of Germany *387 and Volkswagen of America. Plaintiffs allege that the decedent suffered fatal injuries because the 1968 Volkswagen she was occupying was defective. Following a bench trial the court rendered judgment in plaintiffs' favor for over two million dollars and defendants have appealed. The basic issue is whether the trial court committed manifest error in finding that the 1968 Volkswagen was defective.
On October 8, 1986, the decedent was a passenger in the Volkswagen driven by Katherine Palmer along St. Bernard Highway when it was struck from the rear by a full-sized GMC pickup truck operated by James Thibodeaux. As a result of the impact, the decedent who was not wearing a seat belt was ejected and propelled backward over the seat back and through the rear window. Her head struck the front of the pickup truck and she came to rest on the ground outside the Volkswagen.
Plaintiffs' theory was that the seat in the 1968 Volkswagen was defective in its design, that the defects were known to the defendants, that alternative designs were widely in use and were known to the defendants, and that they failed to warn the public of the problem. Plaintiffs alleged that decedent would have survived the accident had it not been for the defects in the seat. To prove their theories plaintiffs called as expert witnesses George Liebkemann, Robert Lipp, and Byron Bloch.
Liebkemann was recognized as an expert in mechanical engineering. For eleven years he worked for Boeing in the space program and in 1973 he started a consulting mechanical engineering business. Over the years he has engaged in failure analysis of components of automobiles including seats. However, he has never worked in design of automobile seats.
In his inspection of the wrecked Volkswagen he found that the seats had come apart from the floor. These seats are on runners which slide in channels attached to the floor. As a result of the impact, the two channels of the passenger seat separated and the left runner became disengaged from its channel with the result that the entire seat rocked backwards like a lever on a fulcrum. He reasoned that the angle of the impact, with the truck's right front striking the Volkswagen's left rear, placed heavy stress on the passenger and left side of the seat. He referred to Federal Safety Standard 207 which provides that a seat must remain in place in an impact so as to afford protection to the occupant.
Liebkemann explained that a properly designed seat would react to a collision of this type by remaining attached to the floor, but the back cushion would fail with the result that the passenger would be ejected from the seat horizontally and her head would strike the cushioned back seat instead of being thrown through the rear window. In other words the seat must be designed so that the connection to the floor is stronger than the seatback otherwise the design is defective. He thought this was particularly important in a 1968 Volkswagen because of its size and the fact that its engine was in the rear. He explained that the rear impact against the engine block causes more energy to be transferred to the front of the vehicle than in the case of the usual crushable trunk compartment in the rear of the vehicle.
As would other plaintiffs' experts, Liebkemann identified the principal shortcoming of the Volkswagen seat design as the "C" in "C" channel design compared to the "T" into channel design used in most automobiles manufactured in 1968. A drawing by another of plaintiffs' experts is annexed to this opinion and shows the difference between these designs. Liebkemann thought the T design would have prevented the failure in this case. He also thought that the chance of failure could have been reduced by welding a bar between the runners to prevent them from spreading, by installing a U-bolt to strengthen the attachment of the seat to the floor, and by using stronger metal in these components.
On cross examination, Liebkemann acknowledged that had never made any tests to determine whether the changes or improvements he suggested would have prevented the result in this case. He acknowledged that he made no determinations of the G forces exerted upon the vehicle in the accident *388 or the delta V which represents the change in velocity during a collision. However, he agreed with the defendants that "a very severe impact" took place in this accident.
Lipp is a mechanical engineer who qualified as such and as an expert in accident reconstruction. He estimated that prior to impact the truck was moving at 51 mph and the Volkswagen, 3.5 mph. He estimated the delta V at 47. He thought the defect was in the runner and channel system which caused them to spread and to become disengaged. This caused decedent to be propelled rearward and to strike either the rear window or the front of the truck. The use of the T into channel design of the tracks and runners or strengthening of the backrest would have prevented her death.
Byron Bloch was accepted as an expert in auto design over defendants' strenuous objection. As will be discussed hereafter there are issues as to his credentials and as to his right to testify as a witness at all. In any event, Bloch's opinions and conclusions were based upon his studies of films showing various automobile crash tests and the movement of dummy passengers during the crashes. He thought the Volkswagen was defective in that the structure of the seatback allowed it to twist in a rear end collision; the metal in the seat was too weak; there was a "prying up" of the seat from the floor because of the way the seat and its components were assembled; the overlap between C of the runner with the channel was too short permitting it to become easily disengaged; the welding of the frame to the runner was defective; and notches in the runner weakened it. He did not think this accident happened at high speed because there was minimal intrusion into the inside of the vehicle. With this minimal intrusion, he thought the occupants could have survived a 60 mph collision, but he thought the differential speed here was only 35 mph. He thought the pickup in ramming the left rear of the Volkswagen forced the rear downward and lifted the front.
Asked what defendants could have done to correct the defects, Bloch said they could have recalled the 1968 model and attached U-bolts or brackets over the tracks and runners to prevent them from spreading; redesigned the seat belts to provide more restraint to the seats; and retrofitted the tracks with the T in channel design. Had this been done decedent would have survived the crash.
On cross examination Bloch was asked the question whether, given a large enough vehicle traveling at high speed and striking a small vehicle from the rear, could anything be done to protect the passenger in the vehicle struck from behind. He answered as follows:
It depends. Well, there are reasonable measures to minimize the injury causing effect no matter what size vehicle hits you at what speed, and that should be your design goal. So I'm not sure I understand your question. You can be hit by a very large vehicle, and as long as you do not significantly intrude into the occupant survival space, and as long as there are reasonable measures to help absorb the load on the seat efficiently, then it's a survivable accident despite the size of what hit you, or despite the speed of what hit you.
Bloch called the Volkswagen seat "a unique aberration in design ... the weakest, minimalist seat anchorage system ever put on a production car ... the worst seat anchorage system ever." Asked whether he would consider an automobile seat defective if it separated from the floor when it was struck from behind by a Greyhound bus going eighty miles per hour, he replied it depended upon a lot of other circumstances. He admitted that he was incapable of computing G forces and delta V even though recognized authoritative studies discuss accident severity in terms of delta V. Even though he criticized the strength of the metal in the 1968 Volkswagen seats he did know the tensile strength of the metal.
Defendants called three expert witnesses, Lothar Siebert, David Blaisdell, and Verne Roberts. Siebert, a mechanical and safety test engineer for Volkswagen, was of the opinion that the 1968 seat was properly constructed because in a collision the backrest and runner system deform and absorb energy in tandem. He stated that regardless of seat strength, separation will occur in all *389 accidents with a speed difference in excess of 40 mph. His inspection of the vehicle in question disclosed that the left runner had peeled off the track, but the right side was intact. Volkswagen changed from the C in C system to the T in channel in 1971 not because the former was defective, but in order to improve ease of operating the seat.
Siebert acknowledged Rule 207's statement that a seat should not separate from the floor but he said separation of the seat is unpreventable in accidents at high speeds and there is no way to eliminate this potential. He discussed the severity level of this accident in terms of G-forces which relate to vehicle deceleration and delta V which relates to occupant acceleration and deceleration. Delta V depends upon the speed of and difference in weight between the two vehicles.
David Blaisdell is a research engineer specializing in automotive safety and accident reconstruction. He was accepted as an expert in auto safety, analysis and design, accident reconstruction, occupant kinematics, and vehicle collision performance. From his review of the statements and photographs, his inspection of the vehicles and his overall investigation of the accident, he thought the Volkswagen after being struck on its left rear turned completely over before coming to rest on its side. He classified the damage to the pickup as substantial. He stated that delta V is the primary criterion for determining the severity of a collision according to all recognized governmental studies and all authoritative literature. None of these use integrity of survival space as an indicator of accident severity as Bloch did. He defined delta V as the change of velocity of the vehicles during a collision and explained that it depended upon the speed as well as the weight of the vehicles. When a vehicle is struck from the rear, the seats go forward with the vehicle and the force exerted on the car and seat is the G force. But the occupant who is not rigidly restrained and is not a part of the vehicle lags behind in acceleration as the seats deflect and move. Thus, when the seatback declines by 45 degrees an occupant's body will be airborne and point toward the rear seat. Delta-V measures the velocity increase the occupant will experience during the accident.
He computed the delta-V for the Volkswagen in this accident to be between 32 and 37 based upon a difference in speed of 47 mph55 mph. Studies show that accidents in this range of delta V usually produce fatal injuries. He said a delta V of between 32 and 37 was the equivalent of an automobile driven from the fourth or fifth floor of a parking garage and striking the ground after falling 34-45 feet; and he stated that no seats are designed to resist this type of force and they cannot be. He reviewed numerous test results showing dummies being ejected from twisting deforming seats at delta V levels less than that attained in this case.
Discussing Rule 207's preamble which plaintiffs allege was violated based upon the seat's becoming partially detached, Blaisdell reviewed the underlying requirements in the rule and showed that based upon actual tests, the Volkswagen seats withstood the minimum forces they were required to withstand. He explained that the preamble expresses the ideal goal of the rules while the specific minimum requirements are the ones which are binding.
Finally Blaisdell refuted each one of Bloch's charges of defects in the 1968 Volkswagen seats. Subjected to the 9100 inch pound test required by Rule 207, the backrest performed above the average. Bloch's criticism of the welds between the runner and tubular steel in the seat was irrelevant because there was no evidence that welds had pulled through in the collision. As to Bloch's fulcrum-geometry complaint, studies have demonstrated and experts have agreed that this feature in the Volkswagen is stronger than others. Bloch's criticism of the short flanges in the C in C system as allowing slide slippage failed to mention that retainers in the Volkswagen specifically limit side slippage. Blaisdell stated that forces have to be very high to cause a peel back of the runner and that the T in channel does not fare any better in high speed/high delta V accidents than C into C. They come apart in either case.
Blaisdell stated that the seat in this accident sustained a load of over 4000 pounds *390 and that no seat in a car or test car produced up to 1990 could withstand the forces exerted in this accident. No manufacturer could design a seat which would have made this accident survivable because the technology would be cost prohibitive unless the government forced every car manufacturer to comply. The only seat produced today in which the decedent could have survived would be the equivalent of an astronaut's seat. His conclusion was that the seat performed well in this accident and was not defective. He conceded that the T in channel system used by Volkswagen from 1971 was superior to the 1968 C in C, but the T in channel would not have prevented separation in this accident.
Verne Roberts, a mechanical engineer and Ph.D in theoretical and applied mechanics, qualified as an expert in biomechanics, occupant kinematics and highway statistics. He stated that delta V is the standard used to judge accident and injury severity; over half of all fatalities occur at a delta V of 30 and above; and a delta V of 32 constitutes a very severe accident. As a result of a 20/20 program report the federal government reopened a study of seat track and seatback failure in 1947-1970 Volkswagens and the information compiled in that study showed that for cars in its class, Volkswagen performed better than most. The government study showed that in rear end accidents with closing speeds in excess of 30 mph, almost always seats in all size cars fail causing occupants to enter the rear seat area. He described the movement of the decedent following the impact and said she would not have struck the pickup truck had she been wearing a seatbelt, she would not have exited the car had it not rolled over, and the severity of her injuries cannot be attributed to the seat.
Two years after the case was tried the judge rendered judgment assigning extensive written reasons. These contain the following pertinent findings:
1. He rejected the opinion of Blaisdell that the Volkswagen rolled over before coming to rest. From his own inspection of the vehicle he concluded that it did not sustain a significant impact and the impact occurred at a speed which was survivable and not catastrophic;
2. He was impressed with plaintiffs' three experts, Liebkemann, Lipp, and Bloch but not with defendants' Siebert, Blaisdell, and Roberts commenting that Blaisdell and Roberts had often testified for Volkswagen in other cases and Siebert, while knowledgeable, was biased because he was employed by Volkswagen;
3. He found that seat belts would have afforded little or no protection to decedent;
4. He found the Volkswagen was defective because of the C in C connection which enabled the seat to become disengaged from the floor in combination with the rigid engine block in the rear and the fact that this impact was not centered on the rear of the Volkswagen but was on an angle to the left. He also found the seat to be defective because of the fulcrum effect created by the adjustment knob on the right and the smallness of the metal tubing used in the seat; and,
5. He held that Federal Rule 207 was violated because the seat became disengaged from the floor.
In determining whether these findings are supported by the record, we must first consider whether the trial court properly considered the testimony of Byron Bloch at all. At a pretrial conference in April 1990, the trial court set a deadline of November 16 for the identification of all witnesses who would testify at the trial. On December 31, just a week before trial, plaintiffs identified Bloch to defendants as an additional witness to be called. In response to defendants' objection to his being called, plaintiffs admitted they learned about Bloch in September, but could not locate him until later. In overruling defendants' objection the trial judge adopted plaintiffs' argument that Bloch had testified against Volkswagen so often that they knew what he would say and suffered no prejudice by his being called on short notice. The ruling of the trial court on this point made the court's own previous order meaningless and prejudiced defendants in the preparation of their case. As in Williams v. General Motors Corp., 93-0287 (La.App. 4th Cir. 2/11/94), 639 So.2d 275 *391 writs denied, 94-1896, (La. 11/11/94), 644 So.2d 387, 388, the trial court abused its discretion in allowing Bloch to testify. However, this proved to be harmless, because Bloch failed to qualify as an expert.
LSA-C.E. art. 702 provides:
If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
To qualify as scientific evidence, an inference, assertion, or opinion must be derived by scientific method. First, the trial judge must determine in a preliminary hearing, which did not occur in this case, that the expert is proposing to testify to actual scientific knowledge. Second, the trial judge must determine whether such knowledge will assist him in understanding or determining a fact issue. The factors to determine admissibility are: 1. The testability of the expert's theory or technique; 2. Whether the theory or technique has been subjected to peer review and publication; 3. The known or potential rate of error; and, 4. Whether the methodology is generally accepted in the scientific community. As proponents, plaintiffs must show that the testimony offered is based on sound scientific procedures and acceptability of the methodology validating the proposition. Conclusory testimony is no longer enough, but must be supported to some extent with the scientific methodology employed to verify the hypothesis. Daubert v. Merrell Dow Pharmaceuticals, ___ U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); Clement v. Griffin, 91-1664 (La.App. 4 Cir. 3/3/94), 634 So.2d 412, 424-427 (La.App. 4th Cir.1994), writ denied 94-07117, 637 So.2d 478, 479. Plaintiffs failed to make the showings outlined above and consequently failed to show that Bloch would testify as to actual scientific knowledge.
Bloch testified as to his qualifications. He earned a Bachelor of Arts in industrial design from UCLA in 1960 to 1961. In the late 1960's and the early 1970's he testified in writing and orally before committees of both houses of Congress, particularly in 1973 to a House Committee investigating automotive safety, including testimony on the VW seat which would come off its anchorages. His testimony was based upon personally investigating, examining, and evaluating VWs, and was supported by case examples and crash tests. He allegedly qualified as an expert in a VW case in Los Angeles and testified by way of deposition in other cases in the 1970's. He testified as an expert in one other VW seat case tried in Hawaii, involving the slightly large VW "square back" model.
He did not obtain a degree from an engineering school. At Northwestern University, he enrolled in the engineering school for four quarters and was placed on academic probation for one quarter, and subsequently dismissed from the engineering school. He then went to the University of Kansas for one quarter in electrical engineering, received two D's and an F, and was put on academic probation. He then went to the University's school of industrial design and was put on probation and took no engineering courses. He then transferred to UCLA's College of Applied Arts where he obtained his degree. He has never obtained a license in any engineering field, or any other field.
He then went to work first for Hoffman Electronics which had nothing to do with auto design. He worked for three months and was laid off. His second job was with Controls Company of America and he was fired after six months. He then went to Coastal Dynamics Corporation where he was fired after a few months. He then went to Dunlap and Associates for two years and he worked in human factors engineering applied to military weapons systems and industrial systems. He was involuntarily released from that job. He then went to Industrial Electronic Engineers as product planning coordinator and in applied industrial design and human factors engineering. He stayed there for one year and then left to become an independent consultant. None of these positions involved work in automobile design or engineering or with automobiles in any way. After this undistinguished academic and employment history, he embarked upon his career as an independent consultant/expert which he has pursued ever since.
*392 He has no employees, facilities, or equipment. The only reason given by the trial judge for accepting Bloch as an expert was: "He has been qualified by courts across the land, and I do not presume that all of them were incorrect." Testimony before other judges and juries is not "peer review." Scientific expertise and dogma should not be judged by a standard of res judicata. Courts decide individual cases, but the scientific community sets scientific standards.
When read in light of his actual qualifications, the substance of Bloch's testimony makes it abundantly clear that though he may have a generalized understanding of the mechanics of auto design, he could not make the necessary scientific or mathematical calculations upon which to base his theories. He admitted that the National Accident Severity Study and National Crash Severity studies discuss accident severity in terms of delta V but he could not support his opinion about the severity of the crash in this case in terms of G forces and delta V and how they relate to survivable seat design. Additionally, he did not calculate the tensile strength of the metal used in the seat structure even though he found the structure inadequate in strength.
He claimed that he did not need to calculate this information because sufficient information existed upon which to base his opinion. His opinion is solely based upon a visual inspection of the car, and "his past experience." He testified that he witnessed crash tests and conducted two of his own. He opined that the collision was survivable because the damage to the VW appeared moderate, the intrusion in to the survival space was minimal, and the driver survived. From this he also concluded that the collision did not occur at a high rate of speed. Since Bloch's expert testimony was not supported by scientifically reliable data, the trial court erred in allowing him to testify as an expert in auto design.
With respect to the credibility of defense experts, the trial court judge abused his discretion and committed manifest error in discounting their testimony. Whatever Blaisdell's demeanor might have been at trial, the record shows that he was a knowledgeable witness. Plaintiffs' own expert Lipp consistently relied upon him and agreed with his mathematical calculations. The law does not condone automatic exclusion of a qualified witness simply because he has testified in other cases for the same party. The trial court's reasoning for rejecting Blaisdell's testimony solely because he has testified for VW in other cases is highly suspect considering that Bloch, whose testimony the trial judge completely accepted, has made a virtual career of testifying against Volkswagen. A fair reading of Blaisdell's testimony makes it clear that he was extremely qualified as an expert in auto design and accident reconstruction and his opinions were firmly supported by scientific data and calculations. As to Siebert, nothing in the record supports the trial court's finding that Siebert was an unreliable fact witness because he was biased. Although Siebert was an employee of VW, plaintiffs' experts could as easily be classified as "employees" of plaintiffs as they were hired by plaintiffs to present testimony in their behalf.
In any event, the record demonstrates that the trial court's reasons for judgment were not based upon the opinions of any experts but rather upon his own subjective opinions formed after he viewed the Volkswagen and the other physical evidence. For example, based upon his visual inspection of the Volkswagen he concluded that the impact was not significant and the collision was not severe but survivable. These conclusions were contrary to the opinions of every knowledgeable expert including plaintiffs' own experts.
All experts agreed with certain general laws of physics which occur in a rear end collision. Upon impact, the impacted vehicle accelerates forward. An occupant is separate from her car seat and is not fully restrained in a rigid seat structure which makes her a part of the seat. Thus, she becomes suspended as the car and seat accelerate forward. Because a body will move toward the rear in a rear end collision, car seats are designed so that the backrest declines or deforms during the course of the accident, absorbing energy, and allowing the occupant to move to the back seat. Within *393 milliseconds, the occupant winds up in the back seat as the rear end of the car speeds forward and catches-up to the occupant.
All experts, including Bloch, but excepting Liebkemann, who did not calculate the delta V or G forces, agreed that the reputable private and federal studies and reports use the delta V calculation as the primary criterion for determining the severity of accidents. Delta V represents the change of velocity during collision, not the change of speeds. However, the trial judge ignored the role that the delta V and G forces played in this accident. He declined to discuss severity in these terms. Although plaintiffs' expert Lipp could define delta V and acknowledged its significance, he could not calculate the delta V and did not attempt to do so prior to trial. Bloch could not calculate it. The only expert who could discuss delta V in detail and make the mathematical calculations was defense expert Blaisdell.
Blaisdell defined delta V as a change in the occupant's velocity. Because the occupant is not a part of the car and is not rigidly restrained, when the car is struck the occupant lags behind in the acceleration of the car as the seat deflects and moves. Thus the delta V measures the velocity change the occupant picks up or experiences during the accident separate and distinct from the velocity change of the car. The calculation factors include speeds, car weights, sizes, and masses, and unless the cars are the same weight, the cars will have different delta V's.
Blaisdell testified that the VW experienced a delta V between 32 and 37 with 33.5 being the median value for fatality according to government statistics. The increase in severity or energy represented by the delta V is calculated exponentially as a square function, i.e., a delta V of 20 mph equals 400, a delta V of 30 mph equals 900. Thus a delta V of 30 is more than double the energy of a 20 mph delta V crash.
Distinct from the delta V is the G force or the rate of change of velocity measuring how fast the cars change from one velocity to another. When a vehicle is hit, the seats go forward with the car, and the force exerted on the car and its seats is the G force. Lipp agreed with Blaisdell's calculations that the G forces in this accident were 20 to 25, with peaks in excess of 25.
Lipp was plaintiffs' accident reconstruction expert. With respect to the speeds at which the cars were travelling at the time of impact, he opined that the VW was travelling at a speed of 3.5 mph. The truck was traveling at a speed of 51 mph. Thus, the closing speed in this accident at the time of impact was 47 mph. His opinion was much like that of Blaisdell who testified that the VW was traveling at a speed of 17 mph and the truck was traveling at a speed of 58 to 67 mph. He estimated the closing speed between 47 to 55 mph. Lastly, Lipp agreed and relied upon the calculations made by Blaisdell that the "crush" time in this accident lasted over a tenth of one second and that the decedent had contacted the back window/grill of the truck a little after 30 milliseconds. Lipp could not be absolutely sure of these numbers because he could not make these calculations.
Based upon the facts in evidence and taking the lower of the calculations, the only conclusion the trial court could have reached is that this accident occurred at a closing speed of 47 mph according to plaintiffs' own accident reconstruction expert Lipp as well as Blaisdell. The uncontradicted testimony was that the VW experienced a delta V of 33.5 mph and G forces between 20 and 25 mph with peaks in excess of 25 which was equivalent to an automobile falling from a four story building. Plaintiff's expert Liebkemann could not assess the accident in terms of delta V, but he stated unequivocally that the impact was "very severe." Despite the opinions of all experts both plaintiffs' and defendants' (except Bloch whose expert credentials were dubious at best) that the closing speed between these vehicles was 47 mph or higher, that the forces generated by the combination of speed and weight of the vehicles were enormous, that both vehicles were totaled and that the accident was very severe, the trial judge simply looked at the wrecked automobile and found that the Volkswagen was not severely damaged and the impact was not significant. This finding was clearly wrong and ultimately led him to the unsupportable conclusion that the Volkswagen *394 was defective causing decedent's death.
The trial court's finding that the VW did not roll over was also clearly wrong. As stated above the only two experts qualified in the field of accident reconstruction were Lipp and Blaisdell. Lipp reconstructed the accident by examining the VW, its seats, photos taken by others, and depositions. Blaisdell's accident reconstruction included a review of police report information and measurements and photos. He examined the VW and truck for crash damage. He went to the scene of the accident and took measurements to reconstruct the development of the accident. To take accurate measurements, he used police report measurements and photos and the impact markings left in the highway pavement. He used this information to run computer simulations to determine how the crash evolved after impact.
Blaisdell concluded that the VW was struck by the truck in the left rear and it rammed up onto the rear of the VW with its grill intruding into the VW rear window, pushing the rear end of the VW down into the pavement. The paint transfer above the VW rear window indicated the extent of the overlap. As the VW was accelerated forward and the truck came off the back end of the VW, the VW with its rear down pirouetted in a roll over coming to rest on its side. The crush lasted over one tenth of a second. The physical damage sustained by the car and the dirt and debris ground into buckled metal indicated that the car rolled over during impact.
Neither Liebkemann nor Lipp contradicted Blaisdell's conclusion that the VW rolled over during the collision. Even Bloch admitted that the VW might have rolled over during the course of the crash. Blaisdell fully explained the dynamics of the crash and why he believed the car rolled over. His testimony was credible and well supported.
This is not an instance where the trial court weighed the conflicting expert testimony, made a credibility determination, and came down on one side. Here the trial court blatantly disregarded all credible and reliable expert testimony and substituted its own non-expert opinion.
Accepted as an expert in occupant kinematics and biomechanics was Verne Roberts a mechanical engineer, Ph.D. in theoretical and applied mechanics. He opined that decedent would not have exited the vehicle had there been no roll over. Further, had the decedent been wearing a seat belt, she would not have struck the rear window/truck grill. Roberts was also qualified as an expert in highway statistics. He testified that the Fatal Accident Reporting System or FARS data gathered by the government showed that in the area of rear end collision fatalities, the VW performed better than most for cars in its class. Only two cars out performed it. The same result was reached in the NHTSA report.
The theory of plaintiffs' case was that the seat design was so weak that the runner peeled off from the track before the seat back deformed, allowing the seat to rock back in a rocking chair motion, and catapulting decedent into the rear window. If the strength of the seat had been greater, the runner would not have separated from the track and decedent would have been thrown into the back seat instead of the back window. The trial court adopted this theory finding that the seat was defective and that it did not meet Federal Motor Vehicle Safety Standard No. 207 which required that a seat not come loose from its anchorages. Based upon all of these facts, the court concluded that the seat was the sole and proximate cause of the injury and death of Carmen Mistich.
At trial, Liebkemann testified that in a severe rear end accident, one of two things will happen. In a rear end impact the force of the occupant is directed against the seatback and not the seat bottom. If the seat remains attached to the floor, the upright will fail to the rear. This is preferable because the occupant will strike the rear seat. However, if the runner disengages from the track, the upright will not fail because the seat itself will rock to the rear before enough force is exerted on the upright. The more the seat back deforms, the more energy is absorbed by the seat, and the occupant is thrown above the back seat into the rear *395 window. He opined that the seat back only deformed two inches instead of thirty before the tracks disengaged.
All experts agreed that the rear engine of the VW made the car less crushable in a rear end collision and thus less energy absorbent. Because of this design, the seats had to absorb more energy than those of other cars. Liebkemann stated that as a result, the force of a rear end impact can be as much as two and one-half times greater than in other cars. However, Blaisdell explained that though the forces exerted on the VW are greater than other cars because of the rear engine, the force is very similar to that exerted on all subcompact cars by virtue of their size in relation to other vehicles. Additionally, the rear engine design acts as a trade off because the stiff rear of the car acts to better preserve the integrity of the occupant space of the rear seat area.
All experts agreed that the T into channel track and runner system was a better and stronger design than the C into C design and that the C into C design is less able to absorb the energy in a rear end collision and is more likely to come loose. However this does not support the conclusion that the C in C was defective or that it was the cause of decedent's death. While Rule 207 expresses the hope that seats will not become disengaged from the floor, no seat can be designed to eliminate the possibility when enough force is exerted in a collision. Tests showed that the prybar effect on a front seat in a rear end collision in excess of 40 mph will cause separation even in a T into channel type seat. Consequently in this accident considering the speed of 47 mph agreed upon by plaintiffs' expert Lipp with defendants' Blaisdell, the C in C design did not cause the death of decedent. The same result would have followed had the seat been a T into channel because of the excessive delta V at work here. The cause of decedent's death was the severity of the impact which would have torn the seat apart regardless of its design. Such a severe impact with the corresponding forces generated thereby cannot be considered the normal use of the product.
We are mindful of the standard of review of the verdict.
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... [A]ppellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.... When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.... [Where] a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989).
We are instructed that before a fact-finder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts [LSA-Const. Art. 5, section 10(B)]. and having done so, not merely to decide if we, as a reviewing court, would have found the facts differently, we have determined that the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, and clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 639 So.2d 216, 221 (La. 1994).
Resolution of the causation issue under the facts of this case does not involve the acceptance of the testimony of one set of experts and the rejection of another based on credibility. The issue here is not credibility of the evidence but sufficiency of the evidence. The expert testimony is not contradictory on the relevant issue of causation. Patterson v. Garic, 411 So.2d 1091, 1094 (La.App. 4th Cir.1982), cert. denied 415 So.2d 950 (La. 1982). Plaintiffs have presented no credible *396 evidence showing that a change of design by VW would have prevented or minimized Mrs. Mistich's fatal injuries given the degree of impact agreed to by all competent experts who testified. Absent such evidence, the manifest error standard does not require affirmance of the trial court's judgment. Kirby v. Langston's Furniture Co., 93-1673 La. App. 4th Cir. 1/27/94, 631 So.2d 1301, writ denied 94-0493 La. 4/7/94, 635 So.2d 1136.
We have concluded that Bloch's testimony was erroneously considered by the trial court. When excluded the trial court's findings have no support even arguably. However, even considering Bloch's testimony the trial court's critical findings are clearly wrong. The record supports the conclusions that this was an accident of such exceptional severity that 1) the passenger was bound to be ejected from the seat even if it had been designed in the manner plaintiffs' experts suggested; 2) the Volkswagen rolled over; and 3) this would have been a fatal accident in any event.
Accordingly, the judgment of the trial court is reversed and there is judgment in defendants' favor against plaintiffs dismissing their suit at their cost.
REVERSED.
*397