558 So.2d 1249 (1990)
Ronald REILLY
v.
DYNAMIC EXPLORATION, INC., et al. consolidated with
William O. BARRETT, Sr.
v.
PRODUCTION MANAGEMENT, INC., et al.
Nos. 88 CA 1984, 88 CA 1985.
Court of Appeal of Louisiana, First Circuit.
February 21, 1990.
Warren A. Perrin, Lafayette, for plaintiff-appellant William O. Barrett, Sr.
Arthur Cobb, Baton Rouge, for plaintiff-appellant Ronald Reilly.
*1250 Charles O'Brien, Baton Rouge, for defendant-appellee Kimray, Inc.
Stephen Wilson, Baton Rouge, for defendant-appellee Stockham Valves and Fittings, Inc.
Before COVINGTON, WATKINS and SHORTESS, JJ.
SHORTESS, Judge.
These are suits for personal injuries resulting from an explosion. The petition of Ronald B. Reilly originally named as defendants Dynamic Exploration, Inc., Production Management Corporation, Inc., Don Dronet, Don Dronet Lease Management, Inc., J. Burton LeBlanc, and Kimray, Inc. The petition of William O. Barrett, Sr., originally named these parties as defendants with the addition of Mid-Continent Underwriters. The suits were consolidated for purposes of trial, and amending petitions made by both plaintiffs named as an additional defendant Stockham Valves and Fittings, Inc. The trial involved only Stockham Valves and Fittings, Inc. (Stockham) and Kimray, Inc. (Kimray), as settlements were apparently made with the other defendants. This appeal arises from a directed verdict in favor of both Stockham and Kimray. Plaintiffs specify error in the granting of the directed verdict and in an evidentiary ruling (the refusal to qualify an expert witness) made during the course of the trial.
FACTS
On the morning of May 4, 1981, Reilly and Barrett began a bypass operation on the No. 2 well at the Mallets Bluff production facility in East Baton Rouge Parish. Reilly was a "gauger" employed by Production Management, Inc. (Production Management) to monitor the production of eight different wells at two different locations, including the four wells located at Mallets Bluff. The facility was owned by Dynamic Exploration, Inc. (Dynamic), who contracted with Production Management for services such as those performed by Reilly.
Barrett was an independent contractor contacted by Reilly to perform the bypass. On the day of the accident Barrett and a two-man crew arrived at the site at approximately 7:30 a.m. Barrett and Reilly discussed the procedure and ordered the necessary materials.
There is some controversy as to appropriate authorization for the bypass job. Don Dronet, a production superintendent with Dynamic, ordered Reilly, a Production Management employee, to have it done. Dronet was out of town on the date of the accident and not present to oversee the operation. No one, in fact, in a supervisory capacity was present, and neither Reilly nor Barrett possessed a schematic diagram of the facility.
The Mallets Bluff field produces a crude oil and "heavy" natural gas[1] mixture. Each of the four wells is connected independently to a high pressure separator which decreases wellhead pressures approximating 1200 psi to approximately 600 psi, then a low-pressure separator which reduces the 600 psi to approximately 200 psi, and then a heater treater which separates water from the oil and gas. The pressure in the heater treater varies between 17 and 25 psi, and it is fueled by dehydrated gas from all four wells on the site; some dehydrated gas is also piped directly (bypassing the heater treater) to a gas vent line that exits the heater treater and is flared in a pit in order to maintain pressure in the heater treater itself.
Reilly testified that he shut in the No. 2 well and isolated the heater treater (by closing a number of valves) prior to beginning the procedure. A valve manufactured by Kimray, located immediately downstream from the heater treater, indicated approximately 17 psi still on the line. Barrett and Reilly attempted to bleed the pressure through an adjusting screw on the top of the Kimray valve, but there was no change on the pressure indicator. An arrow *1251 embossed on the Kimray valve indicated the direction of the vent line flow to be away from the heater treater. Reilly and Barrett testified that they understood the arrow to mean that the valve would only allow flow in that direction,[2] and that they relied upon the arrow to conclude that the safest means to bleed off the pressure would be at the union immediately upstream from the Kimray valve and downstream from the heater treater. Barrett testified the Kimray indicator told him what amount of pressure was upstream but he had no way to determine what pressure, if any, existed downstream from the valve. Barrett and a member of his crew proceeded to break the union. Barrett testified that he heard the familiar hiss of dissipating pressure, then nothing, and then there was an explosion.

EXCLUSION OF PLAINTIFFS' EXPERT
During the course of the trial plaintiffs attempted to qualify Robert D. Owen, a self-employed safety consultant, as "expert in safety as it relates to the practices, procedures, equipment and personnel of the work place...." In traversal, Owen was asked, "in effect [that] means that you're an expert in safety in just everything?" Owen replied, "[w]ell I guess you'd have to interpret it that way, yes."
Defense counsel objected to the witness being qualified in a field without parameters. The trial court sustained the objection, commenting, "If you can define parameters, I'll reconsider." Owen was asked additional questions regarding his various clients and the particular services he provided those clients, and was re-tendered as an expert. Defense counsel again objected, and the trial court sustained, explaining that without definable parameters, a ruling on an objection as to a question being beyond Owen's field of expertise would be impossible. Owen was allowed to testify as a lay witness, and much opinion testimony was elicited without objection.
Plaintiffs assert the trial court erred in not accepting Owen as an expert. The discretion of a trial court to refuse or admit a witness as an expert is broad; the decision cannot be reversed absent clear error. Anthony v. Hospital Service District No. 1, 477 So.2d 1180, 1185 (La.App. 1st Cir. 1985), writ denied, 480 So.2d 743 (1986). In view of the reasons given for refusing to admit Owen as an expert and the inability of counsel or the witness to provide some workable limits, we cannot say that the trial court clearly erred.
THE DIRECTED VERDICT
The trial court granted defendants' motion for a directed verdict, dismissing the suit at the close of all the evidence. The motion was granted in open court, and the trial court indicated that written reasons would follow. None have.
Judgments of the trial court are presumed correct, and it is an appellant's burden to show otherwise. Gaudet v. G.D.C. Inc., 451 So.2d 158 (La.App. 1st Cir.), writ denied, 458 So.2d 109 (1984). Where no reasons for judgment exist, we must assume the trial court followed the correct rule of law in arriving at the final judgment. See Pumilia v. Dileo, 169 So.2d 581, 583 (La.App. 4th Cir.1964).
A directed verdict may be granted only when the evidence viewed in a manner most favorable to the motion's adversary allows reasonable jurors no other conclusion. Pritchard v. Safeco Insurance Co., 529 So.2d 449 (La.App. 1st Cir.), writ denied, 532 So.2d 159 (1988). Stated in the affirmative, if a reasonable jury could have found otherwise, the directed verdict constitutes error. Tabor v. Doctors Memorial Hospital, 501 So.2d 243, 245 (La.App. 1st Cir.1986).
*1252 All witnesses with oil field experience, including plaintiffs' experts, testified that opening a line with even 17 to 25 psi is extremely dangerous. Barrett testified that he had bled off such pressures before and that while it was dangerous, it was not unmanageable. Barrett and Reilly both testified that the flow arrow on the Kimray valve meant that the valve would not allow backflow. Thomas A. Hill, vice-president and general manager of Kimray, testified that many valves (as well as other items) used in the oil field are embossed with arrows, but that the arrow is simply used to indicate the direction in which the item is to be installed.
In deposition Barrett testified that he could not recall whether Reilly turned off the inlet valve to the scrubber pot (i.e., the dehydrated gas) or the blue-handled valve to the line exiting the scrubber pot (tying into the vent line upstream from the Kimray valve).[3] At trial Barrett specifically recalled the blue-handled valve being closed.[4] When presented with a photograph depicting the scrubber pot the day after the accident without the blue-handled valve, Barrett explained that he must have been confused.[5] Reilly's deposition and trial testimony regarding the two valves differed similarly.[6]
Barrett and Reilly both testified that the union, which was broken to bleed off the gas, separated sufficiently for Barrett to fit his hands in between the two pipes. Their cause of action against both Kimray and Stockham[7] is based on the theory that both valves allowed backflow from a common manifold into which the vent lines from each of the four wells' heater treaters merged.[8] Plaintiffs' testimony that the union parted sufficiently to determine whether the gas was coming from upstream or downstream is crucial. Barrett testified at trial that the distance was approximately seven inches and that his hand fit in between. When presented with a photograph taken the day after the accident showing the distance to be no more than an inch, he testified simply that there was more distance prior to the fire.
The province of the jury to determine questions of fact demands scrupulous deference. See e.g., Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989). This is particularly so where the fact determinations turn on the respective credibility of the various witnesses. Id. However, if documents *1253 or other objective evidence contradict the testimony, or if the testimony itself is internally inconsistent or implausible to the extent that no reasonable fact finder would credit the testimony, the province of the fact finder is not so inviolable that a reviewing court cannot find manifest error. Id. at 845. Where there are "two permissible views of the evidence," though, the fact finder's choice between them cannot be manifestly erroneous. Id. at 844 (citations omitted). The standard for entering a directed verdict is that reasonable jurors could not arrive at a contrary conclusion. Pritchard, 529 So.2d at 452-453 (citations omitted). Otherwise stated, there cannot be "two permissible views" of the evidence.
The critical conflict in the testimony arises not as between two or more witnesses, in which case credibility alone would be determinative, but rather between plaintiffs' testimony and the objective evidence. See Rosell, 549 So.2d at 844-45. Cf. Tabor, 501 So.2d at 247 (where the testimony of witnesses was in direct conflict and thus inappropriate for factual determinations by this court on the "cold record"). Barrett's testimony at trial is not convincing because the photographs reveal that his hand could not have fit between the pipes and that the blue valve did not exist at the time of the accident. Moreover, Barrett's deposition testimony regarding no recollection at all as to whether Reilly closed off the scrubber pot's dehydrated gas constitutes substantive evidence which stands on its own as an admission. Broussard v. State Farm Mutual Automobile Insurance Co., 188 So.2d 111, 119 (La.App. 3d Cir.), writ denied, 249 La. 713, 190 So.2d 233 (1966), cert. denied, 386 U.S. 909, 87 S.Ct. 855, 17 L.Ed.2d 783 (1967). In Broussard, Judge Tate distinguished prior inconsistent statements of a witness from those of a party, concluding:
[E]xcerpts from the plaintiff Broussard's discovery depositions were in fact offered and introduced as damaging admissions and not for impeachment purposes, even though the trial court had permitted the plaintiff Broussard to be questioned about them and had admitted them into evidence under the impression that they were being offered only to impeach the plaintiff's credibility.
Broussard, 188 So.2d at 119. See also Galiano v. Ocean Accident & Guarantee Corp., 55 So.2d 641, 644 (La.App.) writ denied (unreported) (holding that "in light of ... the record, prior statements may sometimes conclusively impeach and be entitled to greater credence than testimony given from the witness stand"); Thomas v. Jacobs, 459 So.2d 120, 123 (La.App. 2d Cir. 1984) (holding that prior unsworn statements can "conclusively impeach the sworn in court testimony"). We do not hold that a party's statement creates a conclusive presumption or otherwise acts to estop different testimony at trial. See Carson v. Central Progressive Bank, 432 So.2d 891 (La.App. 1st Cir.1983).
The record as a whole clearly supports defendants' theory as to how the explosion occurred, i.e., that the line of dehydrated gas from the scrubber pot connected directly into the vent line upstream from the Kimray valve supplied the combustible fuel which ignited. When the other wells were shut in by operation of the fusible link,[9] the fire died. All four wells at the site supplied heavy gas to the scrubber pot, which supply was not cut off until the fusible link blew.[10] Only plaintiffs' testimony that the two scrubber pot valves were closed controverts defendants' theory, and we have discussed the inconsistencies in that testimony. Plaintiffs' self-serving testimony without any further corroboration from objective evidence and which is contradicted by Barrett's admission is insufficient to support any other view of the evidence.
We find that the result reached by the trial court when it granted a directed verdict dismissing plaintiffs' suits was not *1254 clearly wrong. Costs are taxed to plaintiffs.
AFFIRMED.
NOTES
[1] The natural gas produced at Mallets Bluff contains water and must be dehydrated to make it marketable.
[2] The Kimray valve involved in these proceedings is what is called a "back pressure regulator," the function of which is to control pressure by releasing amounts in excess of a particular predetermined range of pressure (in this case, 17 to 25 psi). A "check valve" acts to allow flow in only one direction. The Stockham valve involved in these proceedings was a "check valve." Notwithstanding that the Kimray valve was not designed to prohibit back flow, tests conducted by Kimray after the accident showed that the valve would prevent back flow (i.e., would allow flow in only one direction) well in excess of 90% of the time.
[3] The scrubber pot is an appurtenance to the heater treater and functions to remove water from the "heavy gas" produced at the field so that gas can be used to fuel the heater treater. The inlet valve, as its name implies, controls the supply from the scrubber pot to the heater treater and directly to the vent line.
[4] At trial, on cross-examination, Barrett testified:

A. I don't care about other testimony there was; I remember well[,] Ron cutting the blue valve off first. And then I said, No, we're going to do it bothcut all three valves off, the one to the burner and the one to the thing; and I know the flames went out.
Q. Now, wait a minute. Now I've got three valves; earlier I
A. Well, I don't care; I mean, what I'm trying to say, I'm talking about the blue valve that was on the top that you talked about. That is the valve Ron cut off; I'm testifying to that.
[5] Barrett explained as follows:

A. I'm saying the blue handle valve or the valve that's on top. It seems to me that I recollect a picture on top of a pot with a blue handle. I saidI meant that at that time. Now, whether it's a blue handle or not, I don't know.
Q. Well, I know. All right. Let's go to your deposition.
A. Through earlier testimony that's how I arrived at a blue handle valve. I don't know whether it was pertaining to that same thing but it seems like there was a picture of this that had a blue handle on it. That's why I say what I'm saying. I may be incorrect in saying it; it may have had a yellow handle or an orange handle. I don't know. But it was a valve at the top of the pot.
Q. Now we have no handle valve.
A. Well, there may bethere was a valve there, put it that way.
[6] Reilly's trial testimony was more equivocal than Barrett's; Reilly testified that he "believed" he closed the valve. When confronted with deposition testimony that he had "probably left [it] open," Reilly offered no explanation.
[7] A "check valve" manufactured by Stockham was located underground, downstream from the Kimray valve.
[8] The vent lines merged at a manifold into a single line which flared at the pit.
[9] The fusible link is a temperature-sensitive device installed in the heater treater system to shut in the wells when it is exposed to high temperatures such as occurred here as the gas burned following the initial explosion.
[10] The No. 2 well was shut in; the others were not.