704 So.2d 1254 (1997)
Irene Myers ODOM, et al., Plaintiff-Appellee,
v.
Lavell JOHNSON, et al., Defendant-Appellant.
No. 97-546.
Court of Appeal of Louisiana, Third Circuit.
December 10, 1997.
Rehearing Denied February 25, 1998.
*1257 Wayland Hankins Vincent, Crowley, for Irene Myers Odom, et al.
Paul Boudreaux, Jr., Alexandria, for Lavell Johnson, et al.
Carol Stookey Hunter, Charles E. Soileau, Rayne, for State, Dept. of Transport.
Errol David Deshotels, Edward Matthew Mouser, Oberlin, for Samantha Odom.
Before WOODARD, SULLIVAN and PICKETT, JJ.
SULLIVAN, Judge.
This personal injury suit involves a January 5, 1995 multiple vehicle accident that occurred on Louisiana Highway 112 in Allen Parish. Matthew Odom, a logging truck driver employed by CR & B Contractors, Incorporated, died from injuries sustained in the accident.
Odom's widow, Irene Myers Odom, filed suit individually and on behalf of her minor children, Samantha Odom, Sabrina Odom and Matthew Odom II, against: (1) Lavell Johnson, the alleged offending motorist; (2) State Farm Mutual Automobile Insurance Company, the alleged liability insurer of the pickup truck and trailer driven by Johnson; (3) Northfield Insurance Company, the alleged uninsured/underinsured motorist (UM) insurer of CR & B Contractors and its president, Carl R. Martin; and (4) the State of Louisiana through the Department of Transportation and Development (DOTD). The issues presented by this appeal include the validity of a CR & B Contractors' UM coverage rejection form, the fault of DOTD, and the adequacy of wrongful death and survival damages.
Soon after plaintiffs filed suit, the trial court dismissed State Farm upon proof of cancellation of the policy that had covered the pickup truck and trailer driven by Johnson. DOTD answered plaintiffs' suit, denied liability and cross-claimed Johnson and Northfield. Johnson also filed an answer in which he denied the allegations of plaintiffs' petition. Northfield denied issuing UM coverage to CR & B Contractors. In their respective answers, DOTD and Northfield prayed for a jury trial.
Before trial, Northfield moved for summary judgment on the UM coverage issue, asserting the insureds, CR & B Contractors and Carl R. Martin, had validly rejected UM coverage. The trial court denied Northfield's motion. Northfield then applied to this court for supervisory writs, which we denied, stating, "[t]he relator has not made a sufficient showing that it is entitled to summary judgment." Odom v. Johnson, W96-605 (La.App. 3 Cir. 5/17/96).
The trial court conducted a jury trial from May 20, 1996 to May 30, 1996. At the close of plaintiffs' evidence, Northfield moved for a directed verdict on the UM rejection issue. The trial court denied this motion. At the close of defendants' presentations of evidence, plaintiffs moved for a directed verdict on the UM coverage issue. The trial court granted plaintiffs' motion and ruled that the Northfield UM coverage rejection form was invalid because: (1) the form was not designed and provided by the insurer, Northfield; (2) the form did not provide for the selection of lower split "per person/per accident" limits; (3) the form was not signed by the named insured or one with authority to sign; (4) Northfield did not give the insured the opportunity to make a meaningful selection from amongst the statutory options; and (5) the UM rejection form was never made a part of or attached to the policy issued to CR & B Contractors and Carl R. Martin.
Thereafter, the jury found Johnson ninety percent at fault and DOTD ten percent at fault in causing the accident. The jury awarded no survival damages for Odom's conscious pain and suffering and awarded $5,500 for funeral expenses. The jury awarded Irene Myers Odom $338,000 in general and special damages and Matthew Odom II $92,500 in general and special damages. The jury awarded Samantha and Sabrina Odom $25,000 each for their loss of consortium. On July 9, 1996, the trial court signed a judgment in accordance with this jury verdict. The trial court assessed ninety percent of court costs to Lavell Johnson and Northfield and ten percent of costs of DOTD. The trial court also decreed that the award was *1258 subject to the provisions of La.Civ.Code art. 2324[1]
Northfield and DOTD suspensively appealed. Plaintiffs answered the appeal seeking an increase in general damages and asserting that the jury erred in finding Odom experienced no conscious pain and suffering prior to death. For the following reasons, we reverse the trial court's directed verdict rendered against Northfield on the issue of UM coverage and find that UM coverage was validly waived by CR & B Contractors. In all other respects, we affirm.

THE ACCIDENT
Highway 112 is a rural, two-laned highway with an east-west traveling direction. The highway cuts through a heavily wooded part of Allen Parish.
The accident occurred near the intersection of Highway 112 and Louisiana Highway 1146. It happened at approximately 1:05 p.m. near a double curve in the roadway, when conditions were clear and the roadway was dry. The speed limit is fifty-five miles per hour. Johnson was driving a Chevrolet pickup truck, with a dual-axle trailer attached to the truck's rear bumper, in the westbound lane. Johnson was hauling three junk cars on the trailer. Johnson's trailer tongue was attached to the truck's bumper by a trailer hitch ball. The safety latch on the top of the trailer tongue had a one-eighth inch diameter wire through the bolt hole. Johnson had bent and twisted the wire together behind the safety latch. Johnson did not attach the trailer safety chains to the truck frame or the bumper. Maude Dauzat followed Johnson in a Ford four-door "dually" pickup truck. Theresa Thigpen followed Dauzat in a Toyota Camry.
About two to three miles from the accident site, the right front wheel of Johnson's trailer came off of the trailer axle and rolled onto the right shoulder alongside the westbound lane. Johnson did not stop to retrieve the missing wheel, and, afterwards, his trailer began to intermittently swerve across the center line.
As Johnson approached the Highway 112Highway 1146 intersection, Odom was traveling at approximately fifty-five miles per hour in the eastbound lane of Highway 112. Odom was driving a logging truck with the trailer in a "piggy-back" position on the rear portion of the tractor. His co-worker, Kevin Thompson, was following Odom in a similarly-configured logging truck. Both trucks were owned by Carl R. Martin, the president of CR & B Contractors, and were insured by Northfield. After Odom and Thompson cleared the intersection, they approached the double curve in Highway 112.
Johnson's trailer became detached from his pickup truck's bumper and crossed the center line into the eastbound lane of travel. Johnson continued to drive westbound. Odom saw the detached trailer rolling toward his truck and initially swerved left into the westbound lane to try to avoid a collision. However, Odom immediately realized that Thigpen was traveling toward his truck in her Toyota Camry. He swerved the truck back to the right to avoid Thigpen's automobile. Thigpen drove off the westbound shoulder and landed in the ditch on the north side of the highway. Johnson's trailer struck one of the left-side trailer tires of Odom's rig as Odom steered onto the eastbound shoulder. Odom then steered left to try to get back onto the highway. As his rig returned to the highway, it began to "yaw," a driving phenomenon characterized by the tires spinning forward and the automobile sliding sideways at the same time. Odom's rig slid sideways across both lanes of Highway 112, went onto the northern shoulder and turned onto its side in the ditch adjoining the shoulder. The cab struck and uprooted a tree located on the back slope of the ditch. The tree was located within DOTD's right-of-way approximately eighteen feet from the travel portion of the highway. The rig came to rest *1259 facing westward, directly opposite from its travel direction. Odom died from injuries suffered in the accident.
Thompson avoided a collision with Johnson's errant trailer by steering onto the eastbound shoulder and across the adjoining ditch. His rig came to rest against a tree beyond the back slope of the ditch.

UM COVERAGE
Northfield issued a commercial automobile insurance policy to CR & B Contractors and Carl R. Martin effective December 9, 1994. The policy was effective for one year from the date of issue. It provided a $500,000 per person, per accident single liability limit. The declarations page indicates that Northfield did not provide CR & B Contractors and Carl R. Martin with UM motorist coverage.
Martin and his wife, Rebecca Martin, CR & B Contractors' Vice-President, obtained the policy through an independent insurance agent, the Morris-Temple Agency of DeRidder, Louisiana. Prior to December 1994, the Martins had obtained commercial automobile insurance through Morris-Temple for about seven or eight years and had always rejected UM coverage. Because Carl spent most of his time in the woods harvesting timber, Rebecca generally handled all of the business and paperwork for the corporation. The Martins received the policy application by mail from the Morris-Temple Agency and reviewed the coverage offered at their home.
A UM coverage rejection-selection form was included with the policy application. The form listed "CR & B Contractors, Inc." as the insured and provided pertinently:

FOR A DETAILED DESCRIPTION OF THESE COVERAGES, REFER TO YOUR POLICY.

UNINSURED/UNDERINSURED MOTORIST COVERAGE
Section 22:1406 of Louisiana law requires that no automobile liability policy shall be delivered or issued for delivery in the state of Louisiana unless uninsured (including underinsured) motorist coverage is provided in the same amount as the bodily injury liability limit in the policy. The insured may reject such coverage or select lower limits by indicating his/her intent in writing.
PLEASE INDICATE ONE OF THE FOLLOWING:
&check; I hereby reject Uninsured (including Underinsured) Motorists Coverage.
&check; I hereby accept Uninsured (including Underinsured) Motorist Coverage with limits of liability equal to the Bodily Injury limits of the policy.
&check; I hereby select Uninsured (including Underinsured) Motorist Coverage with limits of liability of $____________ any one accident, which are less than the Bodily Injury limits of the policy.
* * * * * *
I understand that my coverage selection or rejection, as indicated above, shall apply only on this policy, and all future renewals, until I notify the Northland Insurance Companies IN WRITING of any changes.
 /s/ Carl R. Martin
 /s/ CR & B Contractors
 Signature of Named Insured
 /s/ Dec. 8, 1994
 Date
When the Martins received this waiver form, a typewritten "XX" was in the first box located next to the rejection selection language. Morris-Temple instructed the Martins to initial next to the rejection box and to sign the signature line.
Rebecca Martin testified that she wrote her husband's initials next to the rejection box and signed his name and CR & B Contractors above the signature line on the form. She said that, as vice-president and a board member of the corporation, she has the authority to sign on behalf of the corporation. Rebecca said she and Carl did not want UM coverage and they knew that, by signing the form, they were rejecting UM coverage. She also admitted signing a disclaimer on which she indicated an understanding of UM coverage. On cross-examination, she said that, in December 1994, she thought UM insurance was meant to cover the other uninsured person if he had no insurance. She *1260 acknowledged not understanding that UM coverage would provide assistance to a driver's family if that driver was killed through the fault of an uninsured motorist.
Carl R. Martin testified that the signature on the UM waiver form is his name "but it appears to be my wife's handwriting." He also acknowledged that his initials next to the rejection box were written by Rebecca. According to Carl, when UM coverage "first came out," he discussed the coverage with a Morris-Temple Agency representative and decided that he did not need it. This discussion was not regarding the Northfield policy at issue in this case but involved a prior policy. Carl stated further that, before this accident, he thought UM coverage was insurance he would purchase to cover someone without insurance. He did not understand that UM coverage would provide insurance for a driver's family if the driver was killed by an at fault uninsured motorist. Carl also said that he and Rebecca are the only shareholders of CR & B Contractors and that they make the corporate decisions together. In his view, Rebecca had authority to sign the UM rejection form on behalf of him and the corporation. He said that he knew Rebecca had signed the form and that he never instructed her not to do so.
On cross-examination, Carl was presented with a power of attorney he granted to Rebecca empowering her to sign his name. Carl acknowledged that the power granted to Rebecca was limited to negotiating, entering into, executing and signing logging contracts, stumpage sale agreements, and wood coupons with Boise Cascade Corporation.

Standard of Review and Applicable Law
The trial court granted a directed verdict in favor of plaintiffs on the issue of UM coverage pursuant to La.Code Civ.P. art. 1810. Although this article does not provide specific standards of proof or review for a directed verdict, these standards have been jurisprudentially established. In Carter v. Western Kraft Paper Mill, 94-524, pp. 4-5 (La.App. 3 Cir. 11/2/94); 649 So.2d 541, 544, this court explained the applicable rules as follows:
[A] directed verdict should only be granted when the facts and inferences point so strongly in favor of one party that the court believes reasonable people could not reach a contrary verdict. It is appropriate, not when there is a preponderance of evidence, but only when the evidence overwhelmingly points to one conclusion. Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986). The propriety of granting a directed verdict must be evaluated in light of the substantive law underpinning the plaintiff's claims. Adams v. Travelers Ins. Co., 589 So.2d 605 (La.App. 2d Cir.1991).
Under the foregoing legal principles the question is not whether in our view the plaintiff has proven his case against defendants by a preponderance of the evidence, but rather, whether, upon viewing the evidence submitted, we conclude that reasonable people could not have reached a verdict in favor of the plaintiff against the defendants. Villaronga v. Gelpi Partnership Number 3, 536 So.2d 1307 (La.App. 5th Cir.1988), writs denied, 540 So.2d 327, 328 (La.1989)....
Questions of credibility should not be resolved by a directed verdict. Reilly v. Dynamic Exploration, Inc., 571 So.2d 140 (La.1990). Making credibility evaluations is one of the primary duties of a jury and the trial court may not take this duty from the jury unless the party opposing the directed verdict has failed to produce sufficient evidence upon which reasonable and fair-minded persons could disagree. Royal Ins. Co. v. Fireman's Fund Ins., 532 So.2d 372 (La.App. 3d Cir.1988). Evaluations of credibility play no part in reaching a decision on a motion for directed verdict. Andrews v. Mosley Well Service, 514 So.2d 491 (La.App. 3d Cir.), writ denied, 515 So.2d 807 (La.1987); Campbell [v. Mouton], supra, [373 So.2d 237] at 239-240 [La.App. 1979].
Therefore, on review, to affirm the directed verdict, we must conclude that reasonable people, i.e., the jury, could not have reached a contrary verdictthat Rebecca validly waived UM coverage on behalf of CR & B Contractors. The issue is not whether plaintiffs sufficiently proved the invalidity of the UM rejection by a preponderance of the *1261 evidence, but is, instead, whether reasonable and fair-minded persons could disagree on whether UM coverage was rejected or not. We must evaluate the propriety of the trial court's directed verdict in light of the law governing UM coverage.
La.R.S. 22:1406(D) governs UM coverage. It provides, in pertinent part:
The following provisions shall govern the issuance of uninsured motorist coverage in this state:
(1)(a)(i) No automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle designed for use on public highways and required to be registered in this state or as provided in this Subsection unless coverage is provided therein or supplemental thereto, in not less than the limits of bodily injury liability provided by the policy, under provisions filed with and approved by the commissioner of insurance, for the protection of persons insured thereunder who are legally entitled to recover nonpunitive damages from owners or operators of uninsured or underinsured motor vehicles because of bodily injury, sickness, or disease, including death resulting therefrom; however, the coverage required under this Subsection shall not be applicable where any insured named in the policy shall reject in writing, as provided herein, the coverage or selects lower limits. In no event shall the policy limits of an uninsured motorist policy be less than the minimum liability limits required under R.S. 32:900. Such coverage need not be provided in or supplemental to a renewal, reinstatement, or substitute policy where the named insured has rejected the coverage or selected lower limits in connection with a policy previously issued to him by the same insurer or any of its affiliates. The coverage provided under this Subsection may exclude coverage for punitive or exemplary damages by the terms of the policy or contract.
(ii) After September 1, 1987, such rejection or selection of lower limits shall be made only on a form designed by each insurer. The form shall be provided by the insurer and signed by the named insured or his legal representative. The form signed by the named insured or his legal representative which initially rejects such coverage or selects lower limits shall be conclusively presumed to become a part of the policy or contract when issued and delivered, irrespective of whether physically attached thereto.
(Emphasis added.)
UM coverage is provided by statute and will be read into a policy unless the insured in writing rejects the mandated coverage or selects lower limits. Daigle v. Authement, 96-1662 (La.4/8/97); 691 So.2d 1213. The UM rejection form designed and used by an insurer must inform the applicant of his UM coverage options and thereby give the applicant the opportunity to make a meaningful selection from the statutory options: (1) UM coverage equal to the policy's bodily injury limits; (2) UM coverage lower than the policy's bodily injury limits; or (3) no UM coverage. Tugwell v. State Farm Ins. Co., 609 So.2d 195 (La.1992).
Because UM coverage is statutorily mandated, insurance policies are to be liberally construed in favor of UM coverage. Any rejection or exception to coverage must be "clear and unmistakable." Daigle, p. 3; 691 So.2d at 1214, citing Roger v. Estate of Moulton, 513 So.2d 1126 (La.1987). The rejection (or selection of lower limits) of UM coverage, not the acceptance of UM coverage, must be effected through the affirmative act of the insured. Henson v. Safeco Ins. Cos., 585 So.2d 534 (La.1991). The insurer bears the burden of proving that an insured named in the policy or his legal representative rejected in writing UM coverage or selected lower limits. Cangelosi v. Allstate Ins. Co., 96-159 (La.App. 1 Cir. 9/27/96); 680 So.2d 1358, writ denied, 96-2586 (La.12/13/96); 692 So.2d 375.
We conclude that the trial court erred in granting a directed verdict in favor of plaintiffs on the UM coverage issue. The UM rejection form itself and the testimony of the Martins, in which they both stated they did not want to purchase UM coverage and knew *1262 that by signing the form they rejected UM coverage but also acknowledged that they did not fully understand UM coverage, raise issues upon which reasonable and fair-minded individuals could disagree. Given the conflicting nature of the evidence, a properly instructed jury could certainly have debated the issue of whether Rebecca validly rejected UM coverage on behalf of CR & B Contractors. Clearly, the facts and inferences do not overwhelmingly favor the plaintiffs' position that the UM rejection was not valid.
The trial court's error foreclosed any finding of fact on the part of the jury regarding UM coverage. This interdiction of the fact finding process is a legal error requiring this court to review the case de novo from the record and render a judgment. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95); 650 So.2d 742. We shall therefore examine the UM coverage issue de novo with reference to the five objections to the validity of the UM rejection raised by plaintiffs and adopted in whole by the trial court in rendering the directed verdict.

Design of Form
The trial court found the form defective because the heading, "Northland Insurance Companies" appears thereon instead of "Northfield Insurance Company," the insurer providing the policy. The trial court concluded that, therefore, the form was not "designed by [the] insurer" as required by La. R.S. 22:1406(D)(1)(a)(ii).
The entire insurance policy was entered into evidence as plaintiffs' exhibit number one. The policy's cover page, captioned as a "Commercial Insurance Policy," has the same "Northland Insurance Companies" logo as the UM rejection form and lists three subsidiary companies, including Northfield Insurance Company. The general declarations page also has the "Northland" logo with an "X" in a box denoting that coverage is provided by Northfield Insurance Company. The "Commercial Auto Coverage Part Business Auto Coverage Form" declarations page likewise contains the "Northland" logo at the top.
The law does not mandate that a UM rejection form provided to an insured by an insurer cannot be designed, in whole or in part, by the insurer's parent or holding corporation. Additionally, the law does not require that the particular insurer's name appear on the form, just that the form be designed by the insurer. No evidence was adduced at trial on which company designed the form. We find it reasonable for Northland to design a uniform Louisiana UM rejection form for use by all three of its companies. The inclusion of the "Northland" logo thereon does not invalidate the form, nor does it support the trial court's conclusion that the form was not designed by the insurer.

No Split Limit Option for Lower Limits
The trial court determined that the lack of a split "per person/per accident" limit choice under the selection of lower limits option invalidated the form. In doing so, the trial court relied on this circuit's opinion in Holbrook v. Holliday, 93-1639 (La.App. 3 Cir. 6/1/94); 640 So.2d 804, writ denied, 94-1735 (La.10/7/94); 644 So.2d 642, wherein this court stated:
A form may be easily written to say:
....
I select Uninsured Motor Vehicle coverage with lower limits of $_____/$_____.
Id., p. 8, 640 So.2d at 809.
The trial court's reliance on this language in Holbrook is misplaced. By its use of the permissive "may," the Holbrook court clearly evidenced an advisory or suggestive intent. An insurer is not required to include this suggested language verbatim in its UM waiver form. "It is not the job of the courts to draft insurance forms or to dictate the exact format or wording which must be used for a valid rejection of the mandated UM coverage. The legislature specifically left that task to the insurers." Daigle, pp. 5-6; 691 So.2d at 1216.
The policy at issue provided for a single $500,000 liability limit per accident, regardless of the number of persons injured. We find it reasonable that the "selection of lower limits" option would also be expressed in terms of a single per accident limit. The single limit liability limit is not prohibited by *1263 law, nor is the single lower limit UM selection option. Its inclusion in the UM rejection form did not invalidate the form.

Lack of Authority to Reject
The trial court determined that the UM rejection form was also invalid because it did not list Carl R. Martin as a named insured or a separate UM rejection form was not executed by the co-insured, Carl R. Martin. Additionally, the trial court concluded that Rebecca Martin did not have "general or specific corporate authority" to reject on behalf of the corporation.
UM coverage is not "applicable where any insured named in the policy" rejects it in writing. La.R.S. 22:1406(D)(1)(a)(i). (Emphasis added.) Therefore, any one of the named insureds can reject UM coverage by properly executing a valid UM coverage rejection form. Haney v. Zurich Ins. Co., 96-393 (La.App. 4 Cir. 9/22/96); 680 So.2d 1270, writ denied, 96-2443 (La.12/6/96); 684 So.2d 933; Huguet v. State Farm Mut. Auto. Ins. Co., 619 So.2d 186 (La.App. 3 Cir.), writ denied, 625 So.2d 1059 (La.1993). In this case, either Carl R. Martin or CR & B Contractors could sign a single UM coverage rejection form and the rejection would be binding on the whole policy.
Because only one form was executed, the issue is therefore whether Rebecca Martin had authority to reject UM coverage on behalf of the corporation. She is the vice-president of the corporation and one of two members, along with her husband, of the board of directors. The CR & B Contractors Articles of Incorporation state that the "business affairs of the corporation shall be managed by the board of directors." Both Rebecca and Carl agreed that Rebecca handled the day-to-day business of the corporation while Carl worked in the field. They both agreed that she had authority to execute the rejection form.
A corporation's authorized agent may execute a UM rejection form without the necessity of a corporate resolution evidencing such authority. Delaune v. State Farm Mut. Auto. Ins. Co., 529 So.2d 1289 (La.App. 3 Cir.1988). We conclude that Rebecca had the requisite authority to reject UM coverage on behalf of the corporation. She intended to do so and, in fact, did reject UM coverage by signing the form, "Carl R. Martin, CR & B Contractors." The fact that she signed Carl's name instead of her own is of no moment since she was signing on behalf of the corporation and had the authority to do so.

No Meaningful Selection
The trial court determined that Rebecca Martin did not make a "meaningful selection" from amongst her statutory options, as required by Tugwell, 609 So.2d 195. The trial court found that the typewritten "XX" in the rejection box and the fact that Rebecca said she did not understand the effects of UM coverage amounted to the lack of a meaningful selection.
The inquiry is not whether the insured factually made a meaningful selection but whether "the form used by the insurance company gave the applicant the opportunity to make a `meaningful selection' from his options[.]" Id. at 197. (Emphasis added.) The form itself explains that UM coverage automatically attaches in the amount of bodily injury limits in the absence of a rejection. The form also gives the insured or his representative a choice of the three statutory options. The form, on its face, complies with the statutory and jurisprudential mandates.
Rebecca placed the initials "CRM" next to the rejection box in which a Morris-Temple Agency representative had placed the typewritten "XX." The fact that the "XX" was placed in the rejection box by someone at the insurance agency does not result in invalidation of the rejection. It is sufficient that the insured or his legal representative checks the rejection box or initials next to a mark placed there by the insurer. Nelson v. Ragan, 26,724 (La.App. 2 Cir. 4/5/95); 653 So.2d 185, writ denied, 95-1161 (La.6/16/95); 655 So.2d 332. Rebecca complied with this requirement.

No Attachment of UM Rejection to Policy
The trial court determined that Northfield failed to attach the UM rejection form to the policy until it made a defective attempt to do *1264 so in February 1995, after the accident occurred. It concluded that the rejection was without effect on the date of the accident.
The UM coverage rejection form signed by the insured or his legal representative is conclusively presumed to become a part of the policy when issued, regardless of whether it is physically attached. La.R.S. 22:1406(D)(1)(a)(ii); Scott v. State Farm Mut. Auto. Ins. Co., 96-1030 (La.App. 5 Cir. 4/9/97); 692 So.2d 1342. Therefore, the failure to attach the UM rejection form has no bearing on the issue of its effect.
In summation, we conclude that the Northfield UM coverage rejection form at issue met the statutory and jurisprudential requirements of providing the insured an opportunity to make a meaningful selection. Additionally, Rebecca Martin validly rejected UM coverage on behalf of CR & B Contractors. Thus, no UM coverage applies to the Northfield policy issued to CR & B Contractors and Carl R. Martin.

LIABILITY OF DOTD
The jury determined as follows:
2. Do you find that Defendant, State of Louisiana, Department of Transportation and Development, was at fault which was the legal cause of this accident?
 X Yes __ No
3. What percentages of fault, if any do you assign to the following parties?
 Lavell Johnson 90%
 [DOTD] 10%
On appeal, DOTD asserts the jury erred in finding it at fault and in assessing ten percent of the fault to DOTD. DOTD can be held liable in negligence or strict liability. Under either theory, the analysis is the same because La.R.S. 9:2800 requires plaintiffs to prove governmental defendants knew or should have known of the damage-causing defect, had a reasonable amount of time to remedy the defect and did not do so. Campbell v. Louisiana Dep't of Transp. & Dev., 94-1052 (La.1/17/95); 648 So.2d 898. Essentially, plaintiffs must prove:
(1) the property that caused the damage was in DOTD's custody;
(2) the property was defective because it had a condition that created an unreasonable risk of harm;
(3) DOTD had actual or constructive knowledge of the risk; and
(4) the defect in the property was a cause-in-fact of the plaintiff's injuries.
Bessard v. State, Dep't of Transp. & Dev., 94-0589 (La.11/30/94); 645 So.2d 1134.
DOTD has a duty to maintain the highways and shoulders in a reasonably safe condition for traveling motorists. Campbell, 648 So.2d 898. DOTD also must maintain the area off of the shoulder but within its right-of-way in such a condition that it does not present an unreasonable risk of harm. Miller v. State, Dep't of Transp. & Dev., 95-548 (La.App. 3 Cir. 3/20/96); 679 So.2d 134, writ denied, 96-1674 (La.10/11/96); 680 So.2d 650. Whether a condition is defective and presents an unreasonable risk of harm is dependent upon the facts and circumstances of each case. Id. Likewise, causation is a factual issue to which much deference is accorded the trier of fact. Miller v. Evangeline Parish Police Jury, 95-566 (La.App. 3 Cir. 10/11/95); 663 So.2d 398.
Plaintiffs' expert engineer, Gene Moody, was qualified as an expert in accident reconstruction, civil engineering, structural engineering, transportation safety, and road design, construction and maintenance. He stated that he went to the accident site on June 24, 1995. He stated that the curve in which the Johnson trailer became detached has a "kink" in it whereby the radii of the curve changes as an automobile passes through it. Moody explained that this condition is detected by a driver having to input tighter steering while traveling through the curve. He also found the pavement surface to be "undulating." Although he could not detect any undulations on visual observation, Moody stated they were noticeable while driving through the curve. Moody also stated that DOTD should not have allowed the tree impacted by Odom to grow within eighteen feet of the roadway within DOTD's twenty-six foot northern right-of-way. He said that the nearest tree was located six feet *1265 behind this tree and that the tree grew in this location as a result of DOTD's failure to regularly mow the area. He also performed a ball bank indicator test on the curve, from which he concluded that the curve required a fifty mile per hour advisory speed limit.
Dr. Joseph Blaschke[2], an expert in highway design, traffic engineering, and accident reconstruction, testified on behalf of DOTD. He stated that he observed the accident site on April 4, 1996. He performed a ball bank indicator test, from which he concluded that no advisory speed limit was necessary. Dr. Blaschke found no kinks in the curve, but opined that the roadway radii probably was not consistent through the entire curve because the highway follows an older route. He did not detect any undulations sufficient to cause a trailer to come unhitched. He found nothing outside of American Association of State Highway Traffic Officials (AASHTO) or United States Department of Transportation Resurface, Restoration and Rehabilitation guidelines. Dr. Blaschke said that it is common in Louisiana to find trees growing on the back slope of a ditch and that this particular tree was not "vulnerable" to an impact because it was in a straight portion of the roadway. He concluded that no features of the roadway caused or contributed to the accident.
Because the jury answered the single interrogatory on DOTD's fault positively, we must presume that the jury concluded that the plaintiffs carried their four-pronged burden of proof. Although this is a close issue, we cannot say that the jury erred in deciding the fault issue as it did. The jury was presented with the diametrically opposed opinions of two experts. It apparently chose to believe Moody, plaintiffs' expert, in whole or in part, and, weighing his testimony with the factual evidence, decided that DOTD had custody of a condition creating an unreasonable risk of harm, knew of the condition, and failed to rectify the condition. The jury could have reasonably concluded that the condition caused plaintiffs' harm. Although we may have decided differently, we find no manifest error in the jury's findings of fault and the apportionment of ten percent of fault to DOTD, which is likewise a factual determination. See Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985).

PLAINTIFFS' ANSWER
Plaintiffs assert the jury erred in failing to award survival damages and in awarding inadequate amounts of general damages. The discretion to award general damages vested in the trier of fact is vast. We should rarely disturb general damage awards. Only when the award is "in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances" should an appellate court increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-61 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
On the survival damages issue, the death certificate states that Odom's death was instant. The only evidence of Odom's suffering was presented by Maude Dauzat, who stated that other persons standing around Odom's cab after the accident said they thought they heard him moan. Given this tenuous evidence, we find that the jury did not abuse its vast discretion in not awarding survival damages.
On the general damages issue, we likewise conclude that the jury did not abuse its vast discretion. While the only questionable award, in our view, was the $50,000 to Irene Myers Odom, we cannot say that this amount was abusively low.

DECREE
For these reasons, we reverse the directed verdict rendered in favor of plaintiffs, Irene Myers Odom, individually and on behalf of Matthew Odom II, Samantha Odom, and Sabrina Odom, and against Northfield Insurance Company and render judgment dismissing Northfield Insurance Company from this *1266 suit with prejudice. In all other respects, including the applicability of pre-April 16, 1996 La.Civ.Code art. 2324(B), we affirm.
Costs of this appeal are to be paid one-half by plaintiffs and one-half by the State of Louisiana, through the Department of Transportation and Development.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
WOODARD, J., concurs with reasons.
WOODARD, Judge, concurring.
Given the Louisiana Supreme Court's latest pronouncement, I must vote with the majority regarding "meaningful selection." Notwithstanding, it causes me great concern to interpret "meaningful selection" and "placing the insured in a position of making an informed rejection," dictates of Tugwell v. State Farm Ins. Co., 609 So.2d 195 (La.1992), as being satisfied simply by providing options, which may be totally void of meaning to the insured, from which the insured is to make a selection.
Chief Justice Calogero said it best in his dissent in Gatlin v. Safeway Ins. Co., 97-631 (La.5/1/97); 692 So.2d 1059, 1061:
For just as surely as "an insured cannot exercise an option he does not know exists," Tugwell, 609 So.2d at 199, is an insured prevented from exercising an option of whose existence he is aware but whose content remains a mystery.
....
The mere availability of an option to an applicant is not enoughthe applicant must be sufficiently informed of the nature of that option before the applicant may execute an informed rejection thereof. The average layperson is likely not familiar with the nature of UM coverage....
Such is the predicament in the instant case. Both Mr. and Mrs. Martin "acknowledged that they did not fully understand UM coverage...." Mrs. Martin said "that, in December 1994, she thought UM insurance was meant to cover the other uninsured person if he had no insurance." (Emphasis added.) Likewise, Mr. Martin testified that "he thought UM coverage was insurance he would purchase to cover someone without insurance." The remainder of their testimonies and the context in which they were given reveal that they did not understand the nature of UM coverage as being coverage to benefit them, or those under their employ, in the event that another driver, without insurance or enough insurance, caused them or their employee injury. In fact, what they thought they were waiving was paying for insurance to benefit another unrelated driver without insurance.
Thus, although their UM options may have been on a form, without understanding their meaning, they were but an empty. Accordingly, I cannot conclude that their rejection equates to a "meaningful" or "informed" selection in furtherance of the legislative purpose.
NOTES
[1] La.Civ.Code art. 2324(B) was amended by Act No. 3, § 1 of the 1996 First Extraordinary Session and became effective April 16, 1996. The act changed liability for damages caused by two or more persons from a solidary obligation up to fifty percent of recoverable damages to a joint and divisible obligation. This amendment effected a substantive change in the law. La.Civ.Code art. 6. Because the accident at issue occurred in 1995, the pre-April 16, 1996 version of La.Civ. Code art. 2324(B) applies in this case.
[2] Dr. Blaschke's name was erroneously transcribed as "Blosky." We shall use the correct spelling of his name.